**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

JAMES GRIFFIN,
individually and on behalf
of all others similarly situated,

                                       CIVIL ACTION NO.: _____

        Plaintiff,

v.

JON R. LLEWELLYN, INC.
d/b/a  LLEWELYN CORP OF
AMERICA and SHARON LLEWELLYN,

        Defendants.

_____/

**COLLECTIVE AND CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Plaintiff James Griffin ("Plaintiff" or "Griffin"), individually and on behalf of all other

individuals who are similarly situated, now files this (1) individual and collective action pursuant

to 29 U.S.C § 216(b) for violations of the Fair Labor Standards Act ("FLSA"), (2) class action

pursuant to Federal Rule of Civil Procedure 23 for violation of 26 U.S.C § 7434, and (3) pendent

state law class action claims against Defendants Jon R. Llewellyn, Inc. d/b/a Llewellyn Corp of

America ("Llewellyn Corp") and Sharon Llewellyn ("Mrs. Llewellyn") (collectively "Defendants"

or "Llewellyn"), and in support allege as follows:

### I.       INTRODUCTION

1.       This case involves an employer – Llewellyn Corp – which continues to

misclassify its employees as independent contractors and issue them the Internal Revenue Service

("IRS") Form 1099, despite having been sued previously for breach of contract and having been

the subject of tax audits by the IRS. In some of these prior lawsuits, Llewellyn Corp and its original

President, Jon R. Llewellyn (who was the spouse of Mrs. Llewellyn and the President of Llewellyn Corp until his death) admitted that the misclassified individuals were, in fact, employees. Defendants continue to misclassify their employees in order to reduce the amount of money that Defendants pay to the IRS, the Social Security Administration ("SSA"), the Texas Workforce Commission ("TWC"), and other governmental agencies on behalf of the employees.

2.     In May 2017, Mrs. Llewellyn promoted Griffin to the Director of Business Development ("DBD") position, following the death of her husband. Defendants provided Griffin with a job description for the DBD position, which provided that he was a full – time employee. Nevertheless, Defendants continued to misclassify Griffin and issue him an IRS Form 1099 for his services.

3.     After becoming DBD, Griffin became aware that the classification of him and the other employees as independent contractors was incorrect and violated several federal and state employment laws. The misclassification was confirmed by the then legal counsel for Defendants. Griffin brought this information to Mrs. Llewellyn and requested that Defendants take steps to properly classify the employees and become compliant with these laws.

4.     While Defendants initially expressed some willingness to properly classify the employees and become compliant with these laws, Defendants ultimately decided not to do so and retaliated against Griffin for his complaints that he was misclassified and his efforts to help Defendants become compliant. Among other things, Defendants removed Griffin from the DBD position, told him not to report to the office, would not communicate with him, and, ultimately, terminated his employment. These actions constituted illegal retaliation under the FLSA.

5.     In this action,  Griffin, on his own behalf and on behalf of others similarly situated, seeks to recover (1) overtime compensation not paid by Defendants in violation of the

FLSA; (2) statutory penalties for violation of 26 U.S.C § 7434; (3) unpaid commissions and other compensation owed for breach of an actual or implied employment contract; (4) quantum meruit, as an alternative theory to the breach of contract claims; (5) fraud/misrepresentation; and (6) conversion. Griffin also pursues a claim for retaliation under the FLSA on an individual basis.

## II.   JURISDICTION AND VENUE

6.      Griffin brings this action alleging violations of Federal statutes and is based on various other common law causes of action. This Court has federal question jurisdiction over Griffin's claims for violation of the FLSA and 26 U.S.C § 7434 pursuant to 28 U.S.C. §1331. The Court also has supplemental jurisdiction over Griffin's related claims arising under state law pursuant to 28 U.S.C. §1367(a).

7.      Defendants are subject to personal jurisdiction in this Court because, among other things, they have engaged in systematic and continuous contacts with this District by virtue of their business activities.

8.      Venue is proper within this District under 28 U.S.C. §1391(b), because a substantial part of the events or omissions giving rise to these claims occurred in this District, the Defendants have caused harm to class members residing in this District, and the Defendants are residents of this District under 28 U.S.C. §139l(c)(2) because they are subject to personal jurisdiction in this District.

## III.   THE PARTIES

9.      Plaintiff James Griffin ("Griffin" or "Plaintiff") is a citizen of the State of Texas, residing in Kingwood, Texas.

10.      Defendant Jon R. Llewellyn, Inc. d/b/a Llewellyn Corp of America ("Llewellyn Corp", "LCOFA", or "Defendant") is a Texas corporation with its principal place of business

located at 1075 Kingwood Drive, Suite 203, Kingwood, Texas 77339. Defendant Llewellyn Corp may be served by serving its Registered Agent, Sharon Llewellyn, at 24963 Parsons Mills Drive, Porter, Texas.

11.     Defendant Sharon Llewellyn ("Mrs. Llewellyn") is the President and Director of Llewellyn Corp. Prior to the death of her husband, Jon R. Llewellyn, Mrs. Llewellyn served as the Vice President and/or Secretary of Llewellyn Corp and was one of its Directors. Today, Mrs. Llewellyn and the Llewellyn Family Trust are the owners of Llewellyn Corp. Mrs. Llewellyn may be served at 1075 Kingwood Drive, Suite 203, Kingwood, Texas 77339, 24963 Parsons Mills Drive, Porter, Texas, or wherever she may be found.

## IV.     ENTERPRISE COVERAGE UNDER THE FLSA

12.     Defendant Llewellyn Corp performs predominant use studies that are used to enable companies to reduce their sales taxes and receive sales tax refunds for overpayments. Since 1986, Llewellyn Corp has completed over 40,000 studies that have resulted in tens of millions of dollars in tax savings and sales tax refunds for its clients.  Llewellyn Corp has since expanded to a national service of removing states sales taxes from utility bills for manufacturing, fabricating, and processing companies as well as commercial residential properties where such sales tax exemptions are available. According to its website, there are approximately thirty – five (35) states with statutes in place and as many as three more with potential legislation where Llewellyn Corp is assisting the lobby in favor of passage. Llewellyn Corp also indicates on its website that it is fully insured and staffed with attorneys, engineers, and CPAs to service both large and small companies.

13.     In 2014, two or more employees of Llewellyn Corp used or handled the following items that moved in interstate commerce that are necessary for performing its commercial purpose:

office supplies, electronics, and lighting equipment.

14.     In 2015, two or more employees of Llewellyn Corp used or handled the following items that moved in interstate commerce that are necessary for performing its commercial purpose: office supplies, electronics, and lighting equipment.

15.     In 2016, two or more employees of Llewellyn Corp used or handled the following items that moved in interstate commerce that are necessary for performing its commercial purpose: office supplies, electronics, and lighting equipment.

16.     In 2017, two or more employees of Llewellyn Corp used or handled the following items that moved in interstate commerce that are necessary for performing its commercial purpose: office supplies, electronics, and lighting equipment.

17.     In 2018, two or more employees of Llewellyn Corp used or handled the following items that moved in interstate commerce that are necessary for performing its commercial purpose: office supplies, electronics, and lighting equipment.

18.     In 2019, two or more employees of Llewellyn Corp used or handled the following items that moved in interstate commerce that are necessary for performing its commercial purpose: office supplies, electronics, and lighting equipment.

19.     In 2014, Llewellyn Corp had an annual gross volume of sales made or business done of not less than $500,000.00 within the meaning of 29 U.S.C. § 203(s)(1)(A).

20.     In 2015, Llewellyn Corp had an annual gross volume of sales made or business done of not less than $500,000.00 within the meaning of 29 U.S.C. § 203(s)(1)(A).

21.     In 2016, Llewellyn Corp had an annual gross volume of sales made or business done of not less than $500,000.00 within the meaning of 29 U.S.C. § 203(s)(1)(A).

22.     In 2017, Llewellyn Corp had an annual gross volume of sales made or business

done of not less than $500,000.00 within the meaning of 29 U.S.C. § 203(s)(1)(A).

23.     In 2018, Llewellyn Corp had an annual gross volume of sales made or business done of not less than $500,000.00 within the meaning of 29 U.S.C. § 203(s)(1)(A).

24.     In 2014, Llewellyn Corp had two or more "employees engaged in commerce" as defined by 29 U.S.C. § 203(s)(1)(A).

25.     In 2015, Llewellyn Corp had two or more "employees engaged in commerce" as defined by 29 U.S.C. § 203(s)(1)(A).

26.     In 2016, Llewellyn Corp had two or more "employees engaged in commerce" as defined by 29 U.S.C. § 203(s)(1)(A).

27.     In 2017, Llewellyn Corp had two or more "employees engaged in commerce" as defined by 29 U.S.C. § 203(s)(1)(A).

28.     In 2018, Llewellyn Corp had two or more "employees engaged in commerce" as defined by 29 U.S.C. § 203(s)(1)(A).

29.     In 2019, Llewellyn Corp had two or more "employees engaged in commerce" as defined by 29 U.S.C. § 203(s)(1)(A).

30.     In 2014, Llewellyn Corp had two or more "employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person" as defined by  29 U.S.C. § 203(s)(1)(A).

31.     In 2015, Llewellyn Corp had two or more "employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person" as defined by  29 U.S.C. § 203(s)(1)(A).

32.     In 2016, Llewellyn Corp had two or more "employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by

any person" as defined by  29 U.S.C. § 203(s)(1)(A).

33.      In 2017, Llewellyn Corp had two or more "employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person" as defined by  29 U.S.C. § 203(s)(1)(A).

34.      In 2018, Llewellyn Corp had two or more "employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person" as defined by  29 U.S.C. § 203(s)(1)(A).

35.      In 2019, Llewellyn Corp had two or more "employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person" as defined by  29 U.S.C. § 203(s)(1)(A).

36.      In 2014, Llewellyn Corp was an "enterprise engaged in commerce or in the production of goods for commerce" as defined in the FLSA, § 7(a)(1), 29 U.S.C. § 207(a)(1).

37.      In 2015, Llewellyn Corp was an "enterprise engaged in commerce or in the production of goods for commerce" as defined in the FLSA, § 7(a)(1), 29 U.S.C. § 207(a)(1).

38.      In 2016, Llewellyn Corp was an "enterprise engaged in commerce or in the production of goods for commerce" as defined in the FLSA, § 7(a)(1), 29 U.S.C. § 207(a)(1).

39.      In 2017, Llewellyn Corp was an "enterprise engaged in commerce or in the production of goods for commerce" as defined in the FLSA, § 7(a)(1), 29 U.S.C. § 207(a)(1).

40.      In 2018, Llewellyn Corp was an "enterprise engaged in commerce or in the production of goods for commerce" as defined in the FLSA, § 7(a)(1), 29 U.S.C. § 207(a)(1).

41.      In 2019, Llewellyn Corp is an "enterprise engaged in commerce or in the production of goods for commerce" as defined in the FLSA, § 7(a)(1), 29 U.S.C. § 207(a)(1).

## V.      CORPORATE EMPLOYER UNDER THE FLSA

42.      At all relevant times, the business operations of Llewellyn Corp have been conducted through Defendant Jon R. Llewellyn, Inc.

43.      At all relevant times, Defendant Jon R. Llewellyn, Inc. has maintained all financial accounts used in the operation of Llewellyn Corp, including its payroll account.

44.      At all relevant times, Defendant Jon R. Llewellyn, Inc. has paid all costs associated with the advertising, marketing, and promotion of Llewellyn Corp.

45.      At all relevant times, Defendant Jon R. Llewellyn, Inc. has provided all facilities used in the performance of Griffin's work at Llewellyn Corp.

46.      At all relevant times, the work of National Key Account Managers or sales agents such as Griffin has been an integral part of Defendant Jon R. Llewellyn, Inc.'s business success.

47.      At all relevant times, the work of the Director of Business Development has been an integral part of Defendant Jon R. Llewellyn, Inc.'s business success.

48.      At all relevant times, the sales agents were not required to have any specialized skills, education, training, or knowledge prior to going to work for Defendant Jon R. Llewellyn, Inc.

49.      At all relevant times, Griffin has been an "employee" as defined in FLSA § 3(e), 29 U.S.C. § 203(e) in connection with work at Llewellyn Corp as a matter of economic reality.

50.      At all relevant times,  Defendant Jon R. Llewellyn, Inc. has been Griffin's employer as defined in FLSA § 3(d), 29 U.S.C. § 203(d) as a matter of economic reality.

## VI.    INDIVIDUAL EMPLOYER UNDER THE FLSA

51.      At all relevant times, Mrs. Llewellyn has acted directly or indirectly in the interest of Llewellyn Corp in her interactions with Griffin.

52.     At all relevant times, Mrs. Llewellyn has directly or indirectly controlled the terms and conditions of Griffin's employment with Llewellyn Corp.

53.     At all relevant times, Mrs. Llewellyn has been an owner of Llewellyn Corp.

54.     At all relevant times, Mrs. Llewellyn has been a Director of Llewellyn Corp.

55.     At all relevant times, Mrs. Llewellyn has been an officer of Llewellyn Corp.

56.     At all relevant times, Mrs. Llewellyn – either with her husband, the Llewellyn Family Trust, or individually – has had authority and exercised control over the finances and operations of Llewellyn Corp.

57.     At all relevant times since the death of her husband, if not before, Mrs. Llewellyn has exercised ultimate control over the hiring and firing of Llewellyn Corp's managerial and administrative employees.

58.     At all relevant times since the death of her husband, if not before, Mrs. Llewellyn has had authority and control over Llewellyn Corp's policy of classifying its workers as "independent contractors" for tax purposes.

59.     At all relevant times since the death of her husband, if not before, Mrs. Llewellyn has had authority and control over the terms of Griffin's working conditions.

60.     At all relevant times since the death of her husband, if not before, Mrs. Llewellyn has had authority and control over Llewellyn Corp's recordkeeping policies.

61.     At all relevant times, Mrs. Llewellyn was an "employer" of Griffin as defined in FLSA § 3(d), 29 U.S.C. § 203(d) inasmuch as she was acting directly or indirectly in the interest of Llewellyn Corp in her interactions with Griffin.

## VII.    FACTUAL BACKGROUND

62.     Defendant Llewellyn Corp performs predominant use studies that are used to

enable companies to reduce their sales taxes and receive sales tax refunds for overpayments. A predominant use study is an engineering report which analyzes the cubic foot consumption of each individual natural gas meter or kilowatt – hour consumption of each electric meter.

63.     Since 1986, Llewellyn Corp has performed over 40,000 predominant use studies for manufacturers, processors, fabricators, and rental refurbishment companies as well as commercial residential properties. Llewellyn Corp has since expanded to a national service of removing states sales taxes from utility bills for manufacturing, fabricating, and processing companies as well as commercial residential properties where such sales tax exemptions are available. Indeed, Llewellyn Corp has indicated that "**[o]ur growth over the last 31 years has propelled us into a company providing services for multi-State clients across the country**."

64.     According to Llewellyn Corp, its predominant use studies have resulted in tens of millions of dollars in tax savings and sales tax refunds for its clients.  According to its website, there are approximately thirty – five (35) states with statutes in place and as many as three more with potential legislation where Llewellyn Corp is assisting the lobby in favor of passage. Llewellyn Corp also indicates on its website that it has an "experienced staff" and is fully insured. Llewellyn Corp. also has stated that it is staffed with attorneys, engineers, and CPAs to service both large and small companies.

65.     As part of its business operations, Llewellyn Corp serves assembly plants, aviation and aerospace facilities, audio/visual studios, bakery and food processing plants, beverage and bottling plants, chemical plants, concrete and asphalt production plants, dairy and poultry operations, meat processing operations, nurseries, pharmaceutical laboratories, golf courses, high tech clean room facilities, rental manufacturing, mining operations, oil and gas exploration and refining, and railroads.

66.     In April 2015, Griffin went to work for Llewellyn Corp as a National Key Accounts Manager. Unlike his peers, Griffin had knowledge of the tax recovery business prior to joining Llewellyn Corp. Immediately before joining Llewellyn Corp, Griffin worked for a competitor of Defendant Jon R. Llewellyn, Inc. Griffin later implemented ideas on how to improve Llewellyn Corp's business processes and practices based upon his prior experience.

67.     When he joined Llewellyn Corp, Griffin was required to complete: (1) a W-9, "Request for Taxpayer Identification Number and Certification"; (2) a "Sales Associate Contact Information" Form, which required him to provide his cell number and an emergency contact; (3) "Guidelines for Appropriate Dress," which identified clothing inappropriate as a "company associate"; (4) a "Drug Free/Safe Workplace Policy for Contract Consultants"; and (5) an "Independent Contract Representative Service Agreement" ("Service Agreement"). Despite being referred to as a "company associate," Griffin was treated for payroll purposes, and paid at all times, as an independent contractor.

68.     Defendants also required Griffin and other sales agents and staff to provide a copy of a Certificate of Assumed Name ("d/b/a"), or to obtain a Certificate of Assumed Name and provide it to Llewellyn Corp before commencing work. Since Griffin had operated his own business under the name, "J. A. Griffin Advisory, LLC," he provided a copy of the Certificate of Filing to Llewellyn Corp. Defendants would issue checks made payable to "James Griffin" for his services.

69.     While Llewellyn Corp described Griffin as an "independent contractor" or "ICR" in the Service Agreement, Llewellyn Corp prohibited Griffin from working for its competitors. The Service Agreement provided: "During the term of Agreement, ICR's are not restricted from selling other companies' products or working for other companies **so long as such activities are**

11

**dis-similar and do not conflict with the business of LCOFA** (Llewellyn Corp). **A violation of this regulation shall result in immediate termination of the ICR Agreement**." (emphasis added)

70.    Llewellyn Corp also described the Service Agreement as a "personal services agreement" between it and Griffin. The Service Agreement further stated that it could "not be inherited, bequeathed, transferred or assigned to another party."

71.    The Service Agreement stated: "An ICR will receive information and training by reading  LCOFA's materials and also through verbal communication."

72.    Unknown to Griffin at the time he started working for Llewellyn Corp, Defendants and Jon R. Llewellyn had been audited by the IRS and assessed civil penalties for the underreporting of income and underpayment of taxes. Upon information and belief, Defendants and/or Jon R. Llewellyn misrepresented to the IRS the true employment status of the individuals working for Llewellyn Corp and understated its revenue.

73.     As a National Key Accounts Manager (sales agent), Griffin assisted clients and prospective clients in identifying and recovering overpayments in state sales and use taxes on their purchases of electricity and natural gas.  He worked in that position from April 2015 to May 2017.

74.    In May 2017, Mrs. Llewellyn promoted Griffin to the Director of Business Development ("DBD") position, following the death of her husband who founded the Company. At the time of the promotion, Griffin sent Mrs. Llewellyn a letter outlining the terms of compensation for the DBD position: (1) $72,000.00 a year with $6,000.00 paid monthly in base pay; (2) participation in the sales revenue from the sales team of 5%, to be paid once a month; and (3) payment in full for all commissions earned as a sales agent, less applicable advances, for all sales that he made as a sales agent.

75.     When Griffin assumed the DBD position, Llewellyn Corp provided Griffin with a job description for "Director, Business Development." Llewellyn Corp described the DBD position as "**Employment Classification: Full-Time**."  A copy of the job description is attached as Exhibit "A" to the Complaint.

76.     While Llewellyn Corp indicated that the DBD position was a full-time employment position, Defendants continued to treat Griffin as an independent contractor. Defendants issued Griffin an IRS Form 1099 for his services as the DBD.

77.     The DBD job description identified over ten (10) essential functions for the DBD role. These functions, or duties, included: (1) recruit qualified sales staff; (2) develop training program and train staff on applicable state laws, completion and submission of agent paperwork, techniques in setting sales appointments and closing sales; (3) develop and implement new sales initiatives, strategies and programs to capture relevant leads and motivate agents; (4) assess the strength and weaknesses of the sales team; (5) counsel and retrain underperforming sales agents; (6) lead weekly sales meeting to motivate agents, review sales techniques and discuss established sales goals; (7) establish monthly sales targets for self and sales staff members to ensure these meet or exceed monthly revenue thresholds, as established by the Company; (8) establish monthly prospecting goals for sales development staff and ensure the production of viable leads; (9) produce weekly sales reports for the President (Mrs. Llewellyn), identifying all active accounts that are classed as "work in progress," potential clients/regions, closed sales and lead production results; (10) maintain and update company website for optimum marketing development and strategies; (11) remain current on state laws in existing regions and potential/new laws in other regions; and (12) follow up with clients for fee collection, as necessary. The job description also indicated that Griffin would perform "[o]ther duties as may be required for the company or

position."

78.        Griffin had several responsibilities for Llewellyn Corp in addition to serving as the Director of Business Development. Those duties included: (1) directing the operations of the Company after the former Director of Operations was terminated (and Mrs. Llewellyn made the decision not to replace him); (2) hiring and training a Professional Engineer and Field Tech; (3) working with outside counsel on pending legal matters; (4) coordinating and managing the physical move of Llewellyn Corp; and (5) managing the business office. Griffin was not compensated for these services. Griffin regularly worked well in excess of forty (40) hours a week.

79.        While he was DBD, Griffin worked with outside legal counsel in connection with a lawsuit filed by Llewellyn Corp against its former Director of Operations/Chief Operating Officer and Sales Manager. Throughout the lawsuit, Llewellyn Corp described these two individuals as "former employees." Llewellyn Corp also referred to the individuals working for it as "employees." A copy of the lawsuit in *Jon R. Llewellyn, Inc. d/b/a Llewellyn Corp of America v. Steve Ray Blue ("Mr. Blue") and Kent Taylor ("Mr. Taylor")* is attached as Exhibit "B." While Llewellyn Corp alleged that Mr. Blue and Mr. Taylor were employees in its lawsuit, Defendants paid them as independent contractors and issued them IRS Form 1099s.

80.        These individuals, as well as Griffin and all other individuals working for Defendants, were misclassified as independent contractors. Defendants classified Griffin and these individuals as independent contractors in order to avoid the payment of Federal Unemployment Tax, Federal Insurance Contribution Act ("FICA") taxes, Social Security, and Texas Unemployment Tax, as well as health insurance and other employee benefits.

81.        When Griffin began as DBD, he discovered that Llewellyn Corp was not properly maintaining and disposing of confidential and sensitive customer information and documents.

Griffin engaged a shredding service to properly destroy the records. Griffin also became aware of other instances of inappropriate, and potentially illegal, conduct on the part of Defendants: (1) the falsification of reports and other client documents, including, but not limited to, the improper use of notaries; (2) the failure to pay earned commissions to sales agents; (3) the termination of sales representatives without cause in order to avoid the payment of the owed commissions; (4) the requirement of all sales personnel to execute Independent Contract Agreements which contained unenforceable non-solicitation agreements; (5) a co-mingling of the Llewellyn Corp's assets with Mr. and Mrs. Llewellyn's personal finances and the use of business income to pay for personal expenses; and (6) numerous violations of the anti-discrimination and employment laws. Griffin brought many of these issues to Mrs. Llewellyn's attention. Nothing was done to correct them.

82.     Griffin also discovered that, not only he, but virtually everyone working at Llewellyn Corp, were misclassified by Defendants as independent contractors and were required to execute Independent Contractor Agreements in order to work at Llewellyn Corp. Defendants were well aware that the classification and treatment of Griffin, the sales staff, and other employees misclassified as independent contractors was inappropriate, as the Company had previously been subjected to an audit by the Internal Revenue Service ("IRS"). After he brought this information to Mrs. Llewellyn's attention, she initially told Griffin and others that she wanted to convert the individuals who were improperly classified as independent contractors to employee status and to offer them employee benefits.

83.     Mrs. Llewellyn asked Griffin to investigate the use of a staffing company to minimize any further liability and to ensure compliance with the employment and tax laws. Griffin did so. Griffin also spoke to Llewellyn Corp's prior counsel about the Independent Contract Representative Service Agreement. The counsel informed James that these agreements were not

enforceable and that the business practices were not ethical.

84.     After meeting with staffing companies and Llewellyn Corp's legal counsel, Griffin attempted to have Mrs. Llewellyn meet with the staffing companies and transition the workforce to a staffing company. Mrs. Llewellyn decided not to move forward with those efforts and chose to continue to operate the Company's workforce as independent contractors (including Griffin).

85.     Since he and the others were improperly classified, Defendants are potentially liable under a number of federal and state laws, including the Fair Labor Standards Act ("FLSA"), the Internal Revenue Code ("IRC"), the Social Security Act ("SSA"), the Texas Unemployment Compensation Act ("TUCA"), the Immigration Reform and Control Act ("IRCA"), and other laws dealing with the proper classification and treatment of employees. These laws expose Llewellyn Corp, and Mrs. Llewellyn individually, to potential liability for unpaid overtime, compensation, and liquidated damages; civil penalties for the failure to properly withhold wages, to make contributions for Social Security and Medicare, to pay unemployment taxes, and to maintain documents required under federal and state law.

86.     Griffin regularly worked between 45 and 60 hours a week in his positions at Llewellyn Corp. There are other individuals who were also improperly classified who worked hours in excess of 40 a week.

87.     Until Griffin questioned Mrs. Llewellyn about Defendants' practice of misclassifying individuals as independent contractors, his performance was viewed favorably by Mrs. Llewellyn. Indeed, Mrs. Llewellyn spoke positively about Griffin to Mr. Blue and others.

88.     As Griffin tried to get Llewellyn Corp and Mrs. Llewellyn into compliance with the laws, his relationship with Mrs. Llewellyn deteriorated. Griffin found Mrs. Llewellyn to be

nonresponsive and became concerned over the lack of communication. When Griffin attempted to speak to Mrs. Llewellyn about his concerns about the misclassification of the employees and the failure to pay them what they were due, Mrs. Llewellyn told Griffin to return his keys to the office, mailbox, and post office box, his access card, and his LCOFA credit cards. Defendants then locked Griffin out of the LCOFA email, required him to change his passwords, and told him not to come to the office anymore. Ultimately, Mrs. Llewellyn made the decision to terminate Griffin for raising concerns about legal compliance.

89.      After he was terminated, Defendants told some individuals that he quit and others that he had been fired. Griffin did not resign from the Company or choose to work from home. Since being terminated, Defendants have failed to pay Griffin all of the compensation that he is owed under the terms of his employment with Llewellyn Corp.

90.      As a result of his termination by Defendants, Griffin has suffered lost income and emotional distress.

91.      In September 2018, Mrs. Llewellyn sent a check to Griffin, along with a list of accounts it purported to cover. However, the check amount did not match the reconciliation amount included with the letter, and neither amount was nearly what Griffin is owed. Griffin never deposited the check. Mrs. Llewellyn's actions constitute an admission that Griffin was still owed compensation after being terminated by Defendants.

92.      At all relevant times, Defendants have not relied on any formal opinion of the Department of Labor indicating that their compensation policies and practices are permitted under the FLSA.

93.      At all relevant times, Defendants have not relied on any advice – including but not limited to legal advice – indicating that their compensation policies and practices are permitted

under the FLSA.

94.      At all relevant times, Defendants have failed to "post and keep posted a notice explaining the [FLSA] … in [a] conspicuous place[]," as required by 29 C.F.R. § 516.4.

95.      Defendants' FLSA minimum wage violations were willful within the meaning of 29 U.S.C. § 215.

96.      Defendants' FLSA overtime violations were willful within the meaning of 29 U.S.C. § 215.

## VIII.   IRS TWENTY FACTOR TEST

97.      The IRS has developed a twenty (20) factor test to consider when determining whether a worker is an employee or independent contractor. This test is also used by the Courts and other governmental agencies in determining proper classification.

98.      **Level of Instruction.** If the company controls when, where, and how work is done, this control indicates a possible employment relationship.

99.      In this case, Defendants dictated how the sales agents and other staff performed their jobs. Specifically, Defendants provided the contracts for the sales agents to use when recruiting potential customers and required the agents to perform follow up work after the customer executed any contract with Llewellyn Corp. These duties included, but were not limited to, the delivery of the predominant use studies, the delivery of a bill to the customer, any follow up with the customer regarding the study or the bill, and the retrieval of the check from the customer. This level of control is evidence of an employment relationship.

100.      **Amount of Training.** Requesting workers to undergo company provided-training suggests an employment relationship since the company is directing the methods by which work is accomplished.

101.     In this case, Defendants provided training to the sales agents and other staff as to predominant use studies and how to perform their tasks. This amount of training is evidence of an employment relationship.

102.     **Degree of Business Integration.**  Workers whose services are integrated into business operations or significantly affect business success are likely to be considered employees.

103.     In this case, the sales agents, such as Griffin, are integral to the business operations of Llewellyn Corp. The sales agents contract on behalf of Llewellyn Corp for the provision of the predominant use studies prepared by the other staff members. The degree of business integration is evidence of an employment relationship.

104.     **Extent of Personal Services.**  Companies that are insistent on a particular person performing the work assert a degree of control that suggests an employment relationship. By comparison, an independent contractor is free to assign the work to anyone.

105.     In this case, the Service Agreement between Llewellyn Corp and the sales agents – including Griffin – provided that it was a "personal services agreement."  The requirement that the sales agent perform the services individually is evidence of an employment relationship.

106.     **Control of Assistants.** If a company hires, supervises, and pays a worker's assistants, this control indicates a possible employment relationship. If the worker retains control over hiring, supervising, and paying helpers, this arrangement suggests an independent contractor relationship.

107.     In this case, Defendants provide staff for the sales agents to work with who prepare the invoices and the predominant use reports. The provision of staff is evidence of an employment relationship.

108.     **Continuity of Relationship.** A continuous relationship between a company and

a worker indicates a possible employment relationship.

109.      In this case, Griffin worked exclusively for Llewellyn Corp from April 2015 to May 2018. Other sales agents and staff worked exclusively for Llewellyn Corp over extended periods of time. The continuity of relationship is evidence of an employment relationship.

110.      **Flexibility of Schedule.** If the hours or days of work are dictated by the company, the individuals are likely to qualify as employees.

111.      In this case, most of the individuals worked the hours and days of the week that Llewellyn Corp was open. This is evidence of an employment relationship.

112.      **Demands for Full-Time Work.** Full-time work gives a company control over most of a person's time, which supports the finding of an employment relationship.

113.      In this case, as noted above, Griffin regularly worked in excess of 40 hours a week while working for Llewellyn Corp. Other sales agents worked in excess of 40 hours a week. This is evidence of an employment relationship.

114.      **Sequence of Work.** If the company requires work to be performed in specific order or sequence, this control suggests an employment relationship.

115.      In this case, the negotiation and execution of the agreement with the customer by the sales agent is the first step in the process of preparing the predominant use study. This level of control is evidence of an employment relationship.

116.      **Requirements for Reports.** If a worker regularly must provide written or oral reports on the status of a project, this arrangement indicates a possible employment relationship.

117.      In this case, as noted above, Griffin and the other sales agents were required to provide reports as to the sales manager. When Griffin was the DBD, the sales agents provided reports to him, and he, in turn, provided reports to Mrs. Llewellyn. The requirement to provide

reports is evidence of an employment relationship.

118.     **Method of Payment.** Hourly, weekly, or monthly pay schedules are characteristic of employment relationships. While payment on commission or upon project completion is more characteristic of an independent contractor relationship, the Department of Labor has recognized that a commission can be the "sole source of the employee's compensation or is paid in addition to a guaranteed salary or hourly rate, or on some other basis, and regardless of the method, frequency, or regularity of computing, allocating and paying the commission. It does not matter whether the commission earnings are computed daily, weekly, biweekly, semimonthly, monthly, or at some other interval. The fact that the commission is paid on a basis other than weekly, and that payment is delayed for a time past the employee's normal pay day or pay period, does not excuse the employer from including this payment in the employee's regular rate." *See* 29 C.F.R. § 778.117.

119.     In this case, the commission was the sole source of compensation for the sales agents. This could be evidence of either an independent contractor relationship or employment relationship.

120.     **Payment of Business or Travel Expenses.** Direct reimbursement of travel and other business costs by a company suggests an employment relationship.

121.     In this case, Defendants provided Griffin and other staff with LCOFA credit cards for expenses. This is evidence of an employment relationship.

122.      **Provision of Tools and Materials.** Workers who perform most of their work using company-provided equipment, tools, and materials are more likely to be considered employees. Work largely done using independently obtained supplies or tools supports an independent contractor finding.

123.     In this case, the sales agents perform their work using Llewellyn Corp materials, including contracts and invoices. This is evidence of an employment relationship.

124.     **Investment in Facilities.** Independent contractors typically invest in and maintain their own work facilities. Most employees rely on their employer to provide work facilities.

125.     In this case, Griffin and the sales agents reported to Llewellyn Corp's offices to work. Some of the sales agents did work out of their homes, but still were required to report to the Llewellyn Corp office and interact with staff in the performance of their duties.

126.     **Realization of Profit or Loss.** Workers who receive predetermined earnings and have little chance to realize profit or loss through their work generally are employees.

127.     In this case, as noted above, the sales agents received commissions, but this is not necessarily determinative of an independent contractor relationship.

128.     **Work for Multiple Companies.** People who simultaneously provide services for several unrelated companies are likely to qualify as independent contractors.

129.     In this case, the sales agents were prohibited under the terms of the Service Agreement from working for other companies that perform predominant use studies. This factor is evidence of an employment relationship.

130.     **Availability to Public.** If a worker regularly makes services available to the general public, this supports an independent contractor determination.

131.     In this case, the sales agents were prohibited under the terms of the Service Agreement from working for other companies that perform predominant use studies. This factor is evidence of an employment relationship.

132.     **Control over Discharge.** A company's unilateral right to discharge a worker

suggests an employment relationship. In contrast, a company's ability to terminate an independent contractor relationship generally depends on the terms of the contract.

133.    In this case, the Service Agreement permits Defendants to unilaterally terminate an individual and they have done so in the past. Defendants unilaterally terminated Griffin. This is evidence of an employment relationship.

134.    **Right of Termination.** A company's unilateral right to discharge a worker suggests an employment relationship. In contrast, a company's ability to terminate independent contractor relationships generally depends on contract terms.

135.    In this case, as above, Defendants have unilaterally discharged sales agents, other staff members, and Griffin. This is evidence of an employment relationship.

## IX.    FILING OF FRAUDULENT INFORMATION RETURNS

136.    In 2016, Llewellyn Corp filed an IRS Form 1099 with the Internal Revenue Service categorizing monies earned by Griffin in calendar year 2015 as nonemployee compensation.

137.    In 2017, Llewellyn Corp filed an IRS Form 1099 with the Internal Revenue Service categorizing monies earned by Griffin in calendar year 2016 as nonemployee compensation.

138.    In 2018, Llewellyn Corp filed an IRS Form 1099 with the Internal Revenue Service categorizing monies earned by Griffin in calendar year 2017 as nonemployee compensation.

139.    In 2019, Llewellyn Corp filed an IRS Form 1099 with the Internal Revenue Service categorizing monies earned by Griffin in calendar year 2018 as nonemployee compensation.

140.     Llewellyn Corp's characterization of Griffin's earnings as nonemployee compensation – rather than employee compensation in an IRS Form W-2 – was false, because Griffin was an employee of Llewellyn Corp and not an independent contractor.

141.     Llewellyn Corp has never filed an IRS Form SS-8 (Determination of Worker Status for Purposes of Federal Employment Taxes and Income Tax Withholding) with the Internal Revenue Service, or made any similar attempt to obtain a determination of the correct classification of Griffin and other similarly situated individuals for tax purposes.

142.     In each relevant year, Llewellyn Corp fraudulently misclassified Griffin and other similarly situated individuals as independent contractors and filed fraudulent IRS Forms 1099 with respect to their earnings for the purpose of Llewellyn Corp's own enrichment, which included but not limited to avoiding the payment of minimum wages, avoiding the payment of overtime compensation, avoiding the payment of state unemployment taxes, avoiding the payment of federal unemployment taxes, avoiding state and federal payroll tax contributions, avoiding state workers' compensation taxes, avoiding the payment of Social Security taxes, and avoiding the payment of Medicare taxes.

143.     Mrs. Llewellyn caused the above-referenced IRS Forms 1099 to be filed with the Internal Revenue Service in each relevant year within the meaning of 26 U.S.C. § 7434 by authorizing Llewellyn Corp's accountants and/or bookkeeper to file them and by establishing and/or maintaining Llewellyn Corp's policy of treating sales agents and other staff as independent contractors for tax purposes.

## X.   FLSA COLLECTIVE ACTION ALLEGATIONS

144.     Griffin bring this collective action under the Fair Labor Standards Act ("FLSA"), as individuals and on behalf of all other persons similarly situated who worked hours for which

they were not paid at least minimum wage or worked overtime but were not paid for those hours in accordance with the FLSA ("FLSA Class"), at any time during the period from three years the preceding the filing of this Complaint to the present (the "Class Period").

145.    At the earliest time possible, Plaintiffs seek permission to send a Court-authorized notice of this action pursuant to 29 U.S.C. § 216(b) to all class members who are presently, or have at any time during the three years immediately preceding the filing of this action, worked for Defendants.

146.    The number of persons in the proposed FLSA Class herein is so numerous that joinder of all such persons would be impracticable. The exact number and identities of all such persons are unknown to Griffin at this time and can only be obtained through appropriate discovery.

147.    Griffin and the FLSA Class he seeks to represent are similarly situated, have substantially similar contract agreements and pay provisions and are subject to Defendants' common practice, policy or plan of failing to keep accurate records and failing to pay minimum wage and overtime in violation of the FLSA.

148.    A collective action in this case is superior to any other available method for the fair and efficient adjudication of the claims presented under the FLSA.

149.    Common questions of law and fact exist in this case with respect to the proposed FLSA Class which predominate over any questions affecting only individual members of the same and which do not vary between members.

150.    The common questions of fact involved in this case include, without limitation, whether each member of the proposed FLSA Class herein have: (1) worked hours during the Class Period for which they have not been paid at least the minimum wage required by Federal

law; and, (2) worked hours in excess of 40 in a week during the Class Period but have not been paid premium overtime compensation as required by the FLSA.

151.    The common questions of law involved in this case include, without limitation: (1) whether members of the FLSA Class performed labor for Defendants as employees or as independent contractors; (2) whether Defendants have violated the FLSA by failing to pay its employees at least the legally required minimum wage for each and every hour worked; (3) whether Defendants have violated overtime compensation requirements under the FLSA by failing to pay its employees for hours worked in excess of 40 in a week; and, (4) whether Griffin and those other persons similarly situated are entitled to liquidated damages as a result of any of the legal violations complained of herein, and the nature of such damages.

152.    The claims of the named Plaintiff in this case are typical of those of the other members of the FLSA Class which he seeks to represent, in that, among other things, Griffin and each member of the FLSA Class have sustained damages and are facing irreparable harm because of, and arising out of, a common course of conduct engaged in by Defendants as complained of herein.

153.    Griffin, the named Plaintiff herein, will fairly and adequately represent and protect the interests of the members of the proposed FLSA Class which he seeks to represent. Griffin is represented by an attorney with substantial labor and employment experience and expertise.

154.    Griffin's attorney has identified and thoroughly investigated all claims in this action, and has committed sufficient resources to represent the FLSA Class.

155.    The relief sought in this action is necessary to restore to members of the proposed FLSA Class the money and property which Defendants have illegally acquired through the

unlawful treatment of each class member as described herein.

## XI.   CLASS ALLEGATIONS

156.    Griffin brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief and monetary damages on behalf of a proposed class (the "Rule 23 Class" or "Class") defined as follows: All individuals who are currently working or have work for Defendants and were issued IRS Form 1099s by Defendants.

157.    Subject to additional information obtained through further investigation and discovery, the definition of the Class may be expanded or narrowed by amendment or amended complaint.

158.    The members of the Class are so numerous that joinder of all members is impracticable. Griffin believes that the members of the Class exceed fifty individuals. The exact number of the members of the Class is unknown to Griffin at this time, and can be ascertained only through appropriate discovery.

159.    A class action is superior to any other available methods for the fair and efficient adjudication of this controversy. Griffin knows of no difficulty that will be encountered in the management of the claims advanced by the Class that would preclude class certification.

160.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

161.    The members of the Class are ascertainable in that, upon information and belief, their names and addresses can be identified in business records maintained by Defendants.

162.    There are questions of law or fact common to the Class, including, but not limited to:

(a)     Whether Defendants have unlawfully misclassified the members of the Class as independent contractors, thereby depriving them of benefits they would be otherwise entitled to as employees;

(b)     Whether Defendants' failure to pay members of the Class the benefits owed to them as employees violates Texas and Federal law;

(c)     Whether, as a result of Defendant's material breach, Griffin and members of the Class have suffered an ascertainable loss of monies and/or value;

(d)     Whether Defendants were unjustly enriched;

(e)     Whether Defendants' conduct constitutes fraud and/or negligent misrepresentation; and

(f)     Whether Plaintiffs and Class members are entitled to monetary damages.

163.    These and other questions of law and fact are common to the members of the Class and predominate over any questions affecting only individual members.

164.    Griffin's claims are typical of the claims of the Class because all members of the Class suffered injury in the same way as a result of Defendants' wrongdoing, and the claims of each member arise out of the same nucleus of operative facts and are based on the same legal theories.

165.    Griffin will fairly and adequately represent and protect the interests of the Class. Griffin's counsel is unaware of any conflicts of interest between  the class representatives and absent class members with respect to the matters at issue in this litigation; the class representatives will vigorously prosecute the suit on behalf of the Class. Further, Griffin is represented by attorneys with substantial experience and expertise in complex and class action litigation.

166.    Griffin's attorney has identified and thoroughly investigated all claims in this action, and has committed sufficient resources to represent the Class.

## XII.   CAUSES OF ACTION

### COUNT 1
### (COLLECTIVE ACTION VIOLATION OF FLSA)
### FLSA CLASS ONLY

167.     Griffin repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

168.     Defendants willfully and uniformly misclassified Griffin and all other members of the FLSA Class as independent contractors when in fact each such individual were and/or are employees of Llewellyn Corp.

**Minimum wage violations.**

169.     The FLSA provides that any employee who receives less than the legal minimum wage applicable to the employee is entitled to recover in a civil action the difference between what the employee was paid and the amount that the employee should have been paid, known as back pay, and an equal amount as liquidated damages, plus attorney's fees and court costs.

170.     Defendants have failed to pay Griffin, and all other FLSA Class members similarly situated, at the least the legally required minimum wage for some portion of the hours that each such person worked during the Class Period.

171.     Defendants' failure to pay Griffin, and such other FLSA Class members, at least the minimum wages as required by law, violates the provisions of the FLSA.

172.     By virtue of Defendants' unlawful failure to pay minimum wages to Griffin and all other FLSA Class members when due, all such persons have suffered, and continue to suffer, damages in amounts which are presently unknown to Griffin but which will be ascertained according to proof at trial.

173.     Pursuant to the FLSA, Griffin and all other similarly situated FLSA Class

members are entitled to recover from Defendants the full balance of any and all unpaid minimum wages, plus attorney's fees and court costs.

**Overtime violations.**

174.    The FLSA provides that employees shall not be employed more than 40 hours in one week, unless they receive additional compensation beyond their regular rate of pay in amounts specified by law.

175.    The FLSA provides that an employee who has not been paid overtime compensation may recover, in a civil action, the unpaid balance of the full amount of such overtime compensation, liquidated damages equal to the full amount of unpaid overtime compensation or an award of prejudgment interest, plus attorney's fees and court costs.

176.    At all times relevant hereto, from time to time, Griffin, and all other similarly situated members of the FLSA Class, have worked more than 40 hours in a week, as sales agents.

177.    At all times relevant hereto, Defendants have failed to pay Griffin, and to all other similarly situated members of the FLSA Class, overtime compensation for the hours they worked in excess of 40 hours in one week.

178.    Defendants have failed and refused, and continue to fail and refuse, to pay Griffin and all other similarly situated members of the FLSA Class the amounts owed by Defendants for unpaid overtime compensation.

179.    By virtue of Defendants unlawful failure to pay premium overtime compensation to Griffin and all other similarly situated members of the FLSA Class, all such persons have suffered and continue to suffer, damages in amounts which are presently unknown to Griffin and all other similarly situated members of the FLSA Class but which will be ascertained according to proof at trial.

180.     Griffin, and all other similarly situated members of the FLSA Class, are also entitled to recover the full amount of unpaid overtime compensation, plus attorney's fees and court costs.

## COUNT 2
### (BREACH OF EXPRESS OR IMPLIED CONTRACT)
### RULE 23 CLASS ONLY

181.     Griffin repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

182.     Llewellyn Corp has breached the express or implied contract between the parties to pay commissions on gross revenue received by it from business generated by Griffin and other members of the Class.

183.     Llewellyn Corp's failure to pay Griffin and the Class as promised constitutes a material breach of the express or implied contract.

184.     Griffin and the Class members have been damaged by Llewellyn Corp's actions and are entitled to be compensated for the resulting damages.

## COUNT 3
### (QUANTUM MERUIT/UNJUST ENRICHMENT)
### RULE 23 CLASS ONLY

185.     Griffin repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

186.     Griffin and other members of the Class conferred a benefit on Defendants.

187.     Defendants had knowledge that this benefit was conferred upon them.

188.     However, Defendants have breached their agreement with Griffin and the Class by failing to pay the commissions earned by Griffin and the Class. Such breaches of the agreement have caused the Class damages.

189.     Defendants have been unjustly enriched at the expense of Plaintiffs and the Class members, and their retention of this benefit under the circumstances would be inequitable. Defendants should be required to make restitution.

## COUNT 4
## (INDEPENDENT CONTRACTOR MISCLASSIFICATION)
### Rule 23 Class Only

190.     Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set forth herein.

191.     Despite the existence of an agreement indicating that Griffin and other Class members are independent contractors, Defendants' treatment of and control over them indicate that they are employees who should be protected by wage and hour laws.

192.     Defendants' misclassification deprives Griffin and other Class members of many benefits that they would otherwise be entitled to, including, but not limited to, wage protections, affordable health insurance, workers' compensation benefits, Social Security benefits, and unemployment compensation.

193.     Defendants' unlawful conduct has and continues to damage Griffin and other Class members.

194.     As a result of this unlawful conduct, Griffin and other Class members have suffered damages, including additional tax debt, and additional time and expenses associated with any necessary corrections to their returns.

## COUNT 5
## (CONVERSION)
### Rule 23 Class Only

195.     Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set forth herein.

196.     By tendering a check to Griffin months after his termination, Defendants have acknowledged that they failed to pay Griffin for all amounts owed to him. The amount of the check, however, did not equal the amount owed by Defendants to Griffin.

197.     Defendants have exercised unlawful dominion and control over the funds and monies of Griffin and other Class members, which should have been paid for commissions based upon sales made by Griffin and other Class members.

198.     Defendants' unlawful conduct has and continues to cause Griffin and other Class members economic injury and mental anguish.

## COUNT 6
## (BREACH OF FIDUCIARY DUTY AND
## DUTY OF GOOD FAITH AND FAIR DEALING)
### Rule 23 Class Only

199.     Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set forth herein.

200.     Llewellyn Corp has breached its fiduciary duty, its duty of good faith and fair dealing, and has violated a constructive trust by refusing to relinquish earned income to Griffin and other Class members.

201.     Defendants' unlawful conduct has and continues to cause Griffin and other Class members economic injury and mental anguish.

## COUNT 7
## (VIOLATION OF INTERNAL REVENUE CODE)
### Rule 23 Class Only

202.     Griffin repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

203.     Under the Internal Revenue Code, 26 U.S.C. § 7434(a), "[if] any person willfully files a fraudulent information return with respect to payments purported to be made to any other

person, such other person may bring a civil action for damages against the person so filing such return."

204.      The IRS Forms 1099 that Defendants caused to be filed were fraudulent because they intentionally and recklessly misrepresented Griffin's and other Class members' income as nonemployee compensation.

205.      By failing to properly characterize Plaintiffs and other Class members as employees instead of as independent contractors, and account for, and pay proper FICA taxes on Griffin's and other Class members' behalf as required by the IRS during the course of their employment, Defendants willfully filed fraudulent information returns with the IRS, in violation of 26 U.S.C. § 7434.

206.      Defendants fraudulently misclassified Griffin's and other Class members' income as nonemployee compensation for their own enrichment.

207.      Griffin and other Class members are entitled to all relief afforded by 26 U.S.C. § 7434, including but not limited to their actual damages, a minimum of $5,000.00 per fraudulent filing, and attorney's fees and cost of litigation.

208.      In accordance with 26 U.S.C. § 7434, Griffin shall provide a copy of the Complaint to the Internal Revenue Service upon the filing of such Complaint with the Court.

## COUNT 8
### (FLSA RETALIATION)
### Individual Claim

209.      Griffin repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

210.      By indicating that he and other Class members were misclassified as independent contractors and were not being compensated in accordance with the FLSA, Griffin undertook an

activity protected by 29 U.S.C. § 215(a)(3).

211.    Defendants retaliated against Griffin for his protected conduct by terminating his employment.

212.    Defendants' actions were taken because Griffin asserted his rights under the FLSA.

213.    Defendants' actions caused Griffin emotional distress and mental anguish.

214.    As a result of Defendants' discriminatory acts, Griffin is entitled to recover his lost income and emotional distress that resulted from the retaliation.

## XIII.  MALICE

215.    The fraudulent and unlawful acts of Defendants in maintaining unlawful dominion and control over funds earned by and constructively vested in Griffin and other Class members were committed with malice and/or reckless disregard for their rights and welfare for Griffin and other Class members, for which they are entitled to an award of punitive damages.

## XIV.  CORPORATE SHAM/ALTER EGO

216.    While he was alive, Mr. Llewellyn and Mrs. Llewellyn regularly used the revenue from Llewellyn Corp for personal use, thereby co-mingling their assets with those of Llewellyn Corp. Since his death, Mrs. Llewellyn has continued to use the revenue from Llewellyn Corp for personal use. There exists a unity between the Llewellyn Corp and Mrs. Llewellyn such that the separateness of the corporation has ceased and holding only Llewellyn Corp liable would result in injustice. The acts of Mrs. Llewellyn are the acts of Llewellyn Corp *in toto*. In the interest of justice, Griffin and the others Class members should be allowed to pierce the corporate veil.

## XV.  ATTORNEY'S FEES

217.    Griffin has been compelled to engage the services of the undersigned counsel in

order to protect his legal and equitable rights. Griffin is entitled to recover his reasonable attorney's fees, expenses and costs.

## XVI.  JURY DEMAND

218.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, individually and on behalf of all others similarly situated, by and through their attorneys, hereby demand a trial by jury of all of the claims asserted in this Complaint that are so triable.

## XVII.  PRAYER

WHEREFORE, Griffin, on behalf of himself and the members of the putative FLSA Classes and Rule 23 Class, prays for an order from this Court:

(1) Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure with respect to Counts 2 through 7 as outlined above;

(2) Certifying this action as a collective action pursuant to 29 U.S.C. § 216(b) with respect to Counts 1; and issuing notice pursuant to 29 U.S.C. §216(b) to all similarly situated members of the FLSA Class, apprising them of the pendency of this action and permitting them to assert timely claims in this action by filing individual consent to sue forms pursuant to 29 U.S.C. § 216(b); and equitably toll the statute of limitations from the date of the filing of this Complaint until the expiration of the deadline for filing consent to sue forms under 29 U.S.C. § 216(b);

(3) Designating Griffin as the representative in both the collective action and the class action set forth above;

(4) Entering an injunction prohibiting Defendants from continuing the illegal activities alleged herein;

(5) Entering Judgment in favor of Griffin, the Rule 23 Class and the FLSA Classes and against Defendants for any and all actual, general, incidental, consequential, statutory, punitive,

liquidated, compensatory, punitive, and treble damages in an amount to be determined at trial;

(6) Ordering Defendants to reinstate Griffin;

(7) Awarding pre- and post-judgment interest;

(8) Awarding reasonable costs and expenses of suit, as well as reasonable statutorily mandated attorney's fees;

(9) Awarding Griffin and the Rule 23 Class the sum of $5,000.00 per each year per individual for each violation of 26 U.S.C. § 7435; and

(10) Granting Plaintiffs, the Rule 23 Class, and the FLSA Class such other and further as the Court deems just and necessary.

DATED: August 26, 2019

Respectfully submitted,

**SOUTHERLAND LAW FIRM**

*/s/ J. Alfred Southerland*
J. Alfred Southerland
State Bar No. 18860050
alf@southerlandlawfirm.com
4141 Southwest Freeway
Suite 300
Houston, Texas 77027
Telephone: (281) 928-4932
Facsimile:  (713) 228-8507

**ATTORNEYS FOR PLAINTIFF
JAMES GRIFFIN**